IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| In re DWIGHT L. ATTAWAY, ) | |
| ) | BK CASE NO. 04-33694-WRS-7 |
| Debtors. ) | |
| ) | |

_____

| | |
|---|---|
| MAX FEDERAL CREDIT UNION, ) | |
| ) | |
| Appellant, ) | |
| v. ) | CASE NO. 2:05-cv-1006-MEF |
| ) | |
| DWIGHT L. ATTAWAY, ) | |
| ) | |
| Appellee. ) | |

### MEMORANDUM OPINION AND ORDER

Appellant MAX Federal Credit Union ("MAX") appeals the Bankruptcy Court's determination that an unsecured credit card debt of Appellee-Debtor Dwight L. Attaway ("Attaway") was not precluded from discharge due to actual fraud. After carefully reviewing the parties' submissions, the Court finds, for the reasons set forth below, that the Bankruptcy Court's order is due to be AFFIRMED.

### STANDARD OF REVIEW

District courts function as appellate courts in reviewing the decisions of bankruptcy courts. *In re Sublett*, 895 F.2d 1381, 1383 (11th Cir. 1990). "Factual findings by the bankruptcy court are reviewed under the limited and deferential clearly erroneous standard." *In re Club Assocs.*, 951 F.2d 1223, 1228 (11th Cir. 1992). "In contrast to the deference given to factual findings, this court examines the bankruptcy court's legal conclusions de novo."

*In re Terry Mfg. Co., Inc.*, 332 B.R. 630, 632 (M.D. Ala. 2005). In performing this review, district courts do not have the ability to make independent findings of fact. *Sublett*, 895 F.2d at 1384. "If the bankruptcy court's factual findings are silent or ambiguous as to an outcome determinative factual question, the district court must remand the case to the bankruptcy court for the necessary factual determination." *Id*. (quoting *Wegner v. Grunewaldt*, 821 F.2d 1317, 1320 (8th Cir. 1987)).

## FACTS AND PROCEDURAL HISTORY

In October of 2003, Attaway opened a revolving credit card account with a $5,000 credit limit at MAX and maintained the account in good standing for the next eight to nine months. On July 29, 2004, Attaway resigned from his position as a capitol police officer where he had an annual salary of $33,000. As part of his separation, Attaway liquidated his retirement account and received a payout of between $28,000 and $29,000. Attaway was without employment until September 14, 2004, when he obtained a position with Russell Mills. During the interim, Attaway made a series of transactions. On August 13, he paid off the $5,094.51 balance on his MAX credit card and requested that the account be closed. He also gave approximately $3,800 to his mother, loaned $2,500 to Corliss Pruitt, and repaid a debt of $3,000. In addition, his August 2004 checking account statement reflects several large ATM withdrawals made from casinos.

On September 14, 2004, Attaway began his employment with Russell Mills and worked one twelve-hour shift from 6 p.m. to 6 a.m. At the end of his shift on the morning

2

of September 15, 2004, Attaway contacted MAX and requested that his credit card account be reopened. Attaway informed the MAX representative that he was currently working at Russell Mills, and MAX reinstated the account. That evening, Attaway experienced a great deal of pain as a result of the physical demands of his new job and decided he would be unable to return in the near future. In fact, Attaway would never return to work at Russell Mills and did not find other employment for over a month.

Nevertheless, from September 15 to September 23, Attaway took out six cash advances, one of which was from a casino ATM, that depleted his $5,000 line of credit with MAX. The card's statement closing October 19, 2004 reflected a balance of $5,090.68 made up of $4,255.75 of cash advances, $759.81 of purchases, and $75.12 of finance charges. The minimum payment was $243.68 and was due on November 14, 2004. Attaway did not make this payment or any other payment before filing for bankruptcy protection.

Attaway filed a voluntary petition for Chapter 7 bankruptcy on December 23, 2004. Among his listed creditors, MAX held two unsecured claims—$240 for an overdrawn checking account and $5,165.91 for a consumer credit card. On February 13, 2005, MAX filed a complaint to determine the dischargeablity of the cash advance portion of the debt represented by the credit card. On August 22, 2005, the Bankruptcy Court held a bench trial on the matter and determined that MAX had not established actual fraud on Attaway's part. On Septemeber 2, 2005, MAX timely filed its notice of appeal to bring the matter before this Court.[1]

---

[1] Attaway has not filed a brief in this appeal.

## DISCUSSION

On appeal, MAX argues that Attaway's rapid withdrawal of $4,255.75 worth of cash advances over the course of eight days during which he became unemployed substantiates fraud on the part of Attaway. According to MAX, Attaway knew he would be unable to return to work at Russell Mills when he called to reactivate his card on the morning of September 15, and he never intended to repay the debts he accumulated on the credit card in the days that followed. MAX additionally contends that Attaway defrauded MAX by recklessly disregarding his ability to repay the series of cash withdrawals he made over these few days.

The Bankruptcy Code prohibits an individual debtor from discharging "any debt . . .for money, property, services, or an extension, renewal, or refinancing of credit, to the extent [that debt was] obtained by . . . false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a). To prevail on the question of dischargeability under § 523(a)(2)(A), a creditor must prove that: "(1) the debtor made representations; (2) at the time, the debtor knew the representations were false; (3) the debtor made the false representations with the purpose and intention of deceiving the creditor; (4) the creditor justifiably relied on such representations; and (5) the creditor sustained a loss as a result of the representations." *In re Reach*, 225 B.R. 236, 239 (Bankr. N.D. Ala. 1997). An objecting creditor must demonstrate these elements by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 287 (1991).

Cases involving credit card transactions raise a special set of issues because of the

absence of face-to-face interaction between creditor and debtor when the debts in question are incurred. "Consequentially, the cardholder cannot be said to have directly represented anything to the issuing bank." *In re Meyer*, 296 B.R. 849, 859 (Bankr. N.D. Ala. 2003) (quoting *In re Ford*, 186 B.R. 312, 317 (Bankr. N.D. Ga. 1995)). Also, the very nature of credit card debt belies the assumption that the debtor represents a present ability to repay at the time of purchase. *Id*. Thus, in "using a credit card, a debtor represents only that he intends to abide by th[e credit card] agreement, and has made a false representation only if, at that time the debt is incurred, he intends to breach his agreement." *Id*. Under this formulation, "a credit card debt is not nondischargeable for 'actual fraud' unless the debtor did not intend to honor the terms of the credit agreement at the time the charges were made or the cash advances were taken." *Id*. The lack of contact between debtor and creditor also makes it very difficult for a creditor to provide direct evidence of a debtor's intent not to repay a credit card debt. Courts therefore examine the totality of the circumstances in order to make a case-by-case determination of the debtor's intent to repay. *Id*.

The totality of the circumstances suggests that Attaway's actions are best characterized as financially irresponsible rather than fraudulent. Attaway's activities in August demonstrate his ability to spend large sums of money but also show his general willingness to satisfy his obligations. Indeed, after receiving his retirement money, Attaway immediately disposed of his debts to MAX and other creditors. At the same time, he made a series of large cash withdrawals that closely resemble those taking place one month later in September. Consistent with this approach, Attaway testified at trial that despite his high

level of expenditures in September, he was fully intent on repaying MAX for the credit card debt as soon as he obtained employment that would allow him to do so.[2] This belief was not unreasonable considering Attaway's steady employment history, and his actions of just one month earlier support this assertion. Unfortunately, Attaway's job search took longer than expected and precipitated his bankruptcy filing, but MAX has not provided any evidence to establish that Attaway acted with fraudulent intent in this regard. Thus, while Attaway's decisions cannot be considered prudent, neither were they fraudulent, and therefore, the Bankruptcy Court's conclusion on this issue cannot be set aside as clearly erroneous and must be affirmed.[3]

## CONCLUSION

For the reasons discussed above, the Bankruptcy Court's ruling is AFFIRMED.

Done this the 19th day of June, 2006.

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE

---

[2] Although MAX has sought to demonstrate that Attaway had decided not to return to work at Russell Mills when he called MAX to reinstate the credit card on the morning of September 15, Attaway's uncontradicted testimony established that he did not reach such a conclusion until he awakened later that evening to prepare for his second night shift at Russell Mills. The Court has not been given any reason to doubt this assertion and finds it entirely believable that Attaway would not have experienced the physical pain resulting from his work the night before at Russell Mills until after he woke up in the evening on September 15.

[3] In addition, MAX asserts that the Bankruptcy Court committed a legal error by relying on the absence of "any particular statement that . . . is fraudulent." The Court does not perceive a flaw in this approach because it appears the Bankruptcy Court considered this factor in its overall analysis and did not rely upon it as legally dispositive.